



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

July 19, 2019

*19 cr 30034 MGM*

Timothy Purdon
Robins Kaplan LLP
1207 West Divide Avenue, Suite 200
Bismarck, ND 58501

      Re:   <u>United States v. Anthony Riccitelli</u>

Dear Mr. Purdon:

The United States Attorney for the District of Massachusetts ("the U.S. Attorney") and your client, Anthony Riccitelli ("Defendant"), agree as follows, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B):

    1.   <u>Change of Plea</u>

Defendant will waive Indictment and plead guilty to count One of the Information: Participation in Loan with Financial Institution, in violation of 18 U.S.C. § 1005. Defendant admits that he committed the crime specified in this count. Defendant agrees to the accuracy of the attached statement of facts.

    2.   <u>Penalties</u>

Defendant faces the following maximum penalties: incarceration for 30 years; supervised release for five years; a fine of $1,000,000; a mandatory special assessment of $100; restitution; and forfeiture to the extent charged in the Information.

Defendant understands that, if he is not a United States citizen, pleading guilty may affect Defendant's immigration status. Defendant agrees to plead guilty regardless of any potential immigration consequences, even if Defendant's plea results in being automatically removed from the United States.

3.    Sentencing Guidelines

The parties agree, based on the following calculations, that Defendant's total "offense level" under the Guidelines is 11:

> a)  Defendant's base offense level is 7, because the offense of conviction has a statutory maximum of 20 years or more (USSG § 2B1.1(a)(1));
>
> b)  Defendant's offense level is increased by 6, because the loss amount is more than $40,000 and less than $95,000 (USSG § 2B1.1(b)(1)(D)); and
>
> c)  Defendant's offense level is decreased by 2, because Defendant has accepted responsibility for Defendant's crime (USSG §3E1.1).

Defendant understands that the Court is not required to follow this calculation, and that Defendant may not withdraw his guilty plea if Defendant disagrees with how the Court calculates the Guidelines or with the sentence the Court imposes.

Defendant also understands that the government will object to any reduction in his sentence based on acceptance of responsibility if: (a) at sentencing, Defendant does not clearly accept responsibility for the crime he is pleading guilty to committing; or (b) by the time of sentencing, Defendant has committed a new federal or state offense, or has in any way obstructed justice.

If, after signing this Agreement, Defendant's criminal history score or Criminal History Category are reduced, the U.S. Attorney reserves the right to seek an upward departure under the Guidelines.

Nothing in this Plea Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

4.    Sentence Recommendation

The U.S. Attorney agrees to recommend the following sentence to the Court:

> a)  incarceration within the Guidelines sentencing range as calculated by the parties in Paragraph 3;
>
> b)  a fine within the Guidelines sentencing range as calculated by the parties in Paragraph 3, unless the Court finds that Defendant is not able, and is not likely to become able, to pay a fine;
>
> c)  12 months of supervised release;
>
> d)  a mandatory special assessment of $100, which Defendant must pay to the Clerk

2

of the Court by the date of sentencing;

e)   $80,000 in restitution; and

f)   forfeiture as set forth in Paragraph 6.

5.    <u>Waiver of Appellate Rights and Challenges to Conviction or Sentence</u>

Defendant has the right to challenge his conviction and sentence on "direct appeal." This means that Defendant has the right to ask a higher court (the "appeals court") to look at what happened in this case and, if the appeals court finds that the trial court or the parties made certain mistakes, overturn Defendant's conviction or sentence.  Also, in some instances, Defendant has the right to file a separate civil lawsuit claiming that serious mistakes were made in this case and that his conviction or sentence should be overturned.

Defendant understands that he has these rights, but now agrees to give them up. Specifically, Defendant agrees that:

a)   He will not challenge his <u>conviction</u> on direct appeal or in any other proceeding, including in a separate civil lawsuit; and

b)   He will not challenge his <u>sentence,</u> including any court orders related to forfeiture, restitution, fines or supervised release, on direct appeal or in any other proceeding, including in a separate civil lawsuit.

Defendant understands that, by agreeing to the above, he is agreeing that his conviction and sentence will be final when the Court issues a written judgment after the sentencing hearing in this case. <u>That is, after the Court issues a written judgment, Defendant will lose the right to appeal or otherwise challenge his conviction and sentence, regardless of whether he later changes his mind or finds new information that would have led him not to agree to give up these rights in the first place.</u>

Defendant acknowledges that he is agreeing to give up these rights at least partly in exchange for concessions the U.S. Attorney is making in this Agreement.

The parties agree that, despite giving up these rights, Defendant keeps the right to later claim that his lawyer rendered ineffective assistance of counsel, or that the prosecutor engaged in misconduct serious enough to entitle Defendant to have his conviction or sentence overturned.

6.    <u>Forfeiture</u>

Defendant understands that the Court will, upon acceptance of Defendant's guilty plea, enter an order of forfeiture as part of Defendant's sentence, and that the order of forfeiture may include assets directly traceable to Defendant's offense, assets used to facilitate Defendant's

offense, substitute assets and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense.

The assets to be forfeited specifically include, without limitation, the following:

      a.  $80,000 in United States currency, to be entered in the form of an Order of Forfeiture (Money Judgment).

Defendant admits that $80,000 is subject to forfeiture on the grounds that it is equal to the amount of proceeds the defendant derived from the offense.

Defendant acknowledges and agrees that the amount of the forfeiture money judgment represents proceeds the Defendant obtained (directly or indirectly), and/or facilitating property and/or property involved in, the crimes to which Defendant is pleading guilty and that, due at least in part to the acts or omissions of Defendant, the proceeds or property have been transferred to, or deposited with, a third party, spent, cannot be located upon exercise of due diligence, placed beyond the jurisdiction of the Court, substantially diminished in value, or commingled with other property which cannot be divided without difficulty. Accordingly, Defendant agrees that the United States is entitled to forfeit as "substitute assets" any other assets of Defendant up to the value of the now missing directly forfeitable assets.

Defendant agrees to consent to the entry of an order of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant understands and agrees that forfeiture shall not satisfy or affect any fine, lien, penalty, restitution, cost of imprisonment, tax liability or any other debt owed to the United States.

If the U.S. Attorney requests, Defendant shall deliver to the U.S. Attorney within 30 days after signing this Plea Agreement a sworn financial statement disclosing all assets in which Defendant currently has any interest and all assets over which Defendant has exercised control, or has had any legal or beneficial interest. Defendant further agrees to be deposed with respect to Defendant's assets at the request of the U.S. Attorney. Defendant agrees that the United States Department of Probation may share any financial information about the Defendant with the United States Attorney's Office.

Defendant also agrees to waive all constitutional, legal, and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement.

Defendant hereby waives and releases any claims Defendant may have to any vehicles, currency, or other personal property seized by the United States, or seized by any state or local law enforcement agency and turned over to the United States, during the investigation and prosecution

of this case, and consents to the forfeiture of all such assets.

Defendant agrees to assist fully in the forfeiture of the foregoing assets. Defendant agrees to promptly take all steps necessary to pass clear title to the forfeited assets to the United States, including but not limited to executing any and all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are not sold, disbursed, wasted, hidden or otherwise made unavailable for forfeiture. Defendant further agrees (a) not to assist any third party in asserting a claim to the forfeited assets in an ancillary proceeding, and (b) to testify truthfully in any such proceeding.

7.    Civil Liability

This Plea Agreement does not affect any civil liability, including any tax liability, Defendant has incurred or may later incur due to his criminal conduct and guilty plea to the charges specified in Paragraph 1 of this Agreement.

8.    Breach of Plea Agreement

Defendant understands that if he breaches any provision of this Agreement, Defendant cannot use that breach as a reason to withdraw his guilty plea. Defendant's breach, however, would give the U.S. Attorney the right to be released from his commitments under this Agreement, and would allow the U.S. Attorney to pursue any charges that were, or are to be, dismissed under this Agreement.

If Defendant breaches any provision of this Agreement, the U.S. Attorney would also have the right to use against Defendant any of Defendant's statements, and any information or materials he provided to the government during investigation or prosecution of his case. The U.S. Attorney would have this right even if the parties had entered any earlier written or oral agreements or understandings about this issue.

Finally, if Defendant breaches any provision of this Agreement, he thereby waives any defenses based on the statute of limitations, constitutional protections against pre-indictment delay, and the Speedy Trial Act, that Defendant otherwise may have had to any charges based on conduct occurring before the date of this Agreement.

9.    Who is Bound by Plea Agreement

This Agreement is only between Defendant and the U.S. Attorney for the District of Massachusetts. It does not bind the Attorney General of the United States or any other federal, state, or local prosecuting authorities.

10.   Modifications to Plea Agreement

This Agreement can be modified or supplemented only in a written memorandum signed by both parties, or through proceedings in open court.

\*        \*        \*

If this letter accurately reflects the agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Plea Agreement below.  Please also sign below as Witness.  Return the original of this letter to Assistant U.S. Attorney Alex J. Grant.

Sincerely,

ANDREW E. LELLING
United States Attorney

By:

DEEPIKA SHUKLA
Chief, Springfield Branch Office

6

## ACKNOWLEDGMENT OF PLEA AGREEMENT

I have read this letter and discussed it with my attorney. The letter accurately presents my agreement with the United States Attorney's Office for the District of Massachusetts. There are no unwritten agreements between me and the United States Attorney's Office, and no United States government official has made any unwritten promises or representations to me in connection with my guilty plea. I have received no prior offers to resolve this case.

I understand the crime I am pleading guilty to, and the maximum penalties for that crime. I have discussed the Sentencing Guidelines with my lawyer and I understand the sentencing ranges that may apply.

I am satisfied with the legal representation my lawyer has given me and we have had enough time to meet and discuss my case. We have discussed the charge against me, possible defenses I might have, the terms of this Agreement and whether I should go to trial.

I am entering into this Agreement freely and voluntarily and because I am in fact guilty of the offense. I believe this Agreement is in my best interest.

Anthony Riccitelli
Defendant

Date: 7/23/19

I certify that Anthony Riccitelli has read this Agreement and that we have discussed what it means. I believe Anthony Riccitelli understands the Agreement and is entering into it freely, voluntarily, and knowingly. I also certify that the U.S. Attorney has not extended any other offers regarding a change of plea in this case.

Timothy Purdon
Attorney for Defendant

Date: 7/24/19

7

**United States v. Anthony Riccitelli**
**Criminal No. 19-CR-300_____-MGM**
**Statement of Facts**

In or about October and November 2014, Anthony Riccitelli was a loan officer for Blue Hills Bank ("BHB"), an FCIC-insured financial institution. Riccitelli was the relationship manager for the prospective bank customers, Diecast Connections Company, Inc. ("Diecast") and TJK Realty, LLC ("TJK"), who were headed by Beth Zastawny. Zastawny was seeking to re-finance existing corporate debt owed to Citizens Bank.

Prior to the proposed Blue Hills Bank loan to Zastawny's companies, Riccitelli had maintained a professional relationship with Zastawny for several years. Starting in February 2013, Riccitelli loaned money, through his company West Providence Real Estate or through checks drawn on a joint bank account Riccitelli shared with his mother, to Zastawny in various amounts to help Diecast finance new inventory. Between February 2013 and June 2013, Riccitelli loaned Diecast a total of $70,000. Zastawny repaid Riccitelli through weekly payments that were most often in the amount of $2,500. By August 2013, Zastawny had repaid Riccitelli.

Between September 2013 and January 2014, Riccitelli loaned an additional $65,000, as Zastawny was applying for a loan with Citizens Bank. At that time, Riccitelli worked at Citizens Bank as a loan officer, and he proposed a re-financing of Diecast's existing corporate debt with TD Bank. After Diecast received the loan from Citizens, Zastawny made partial repayment to Riccitelli.

In the fall of 2014, Riccitelli was working at Blue Hills Bank as a loan officer. Part of his job was to identify and cultivate relationships with potential commercial borrowers. On November 7, 2014, Riccitelli formally proposed a loan package for Diecast and TJK. This loan package was subject to review and approval by other people with different roles at the bank with higher levels of authority. BHB undertook a review of the application submitted by Zastawny and the documents submitted by her to determine whether the loan packages met BHB's underwriting standards.

The application and supporting documentation were, in several important respects, false and fraudulent. Zastawny submitted financial statements that did not accurately disclose the level of Diecast's indebtedness when she failed to disclose substantial loans made to Diecast by family, friends, and Riccitelli.

Between December 5, 2014 and January 14, 2015, Riccitelli loaned Diecast $80,000 to meet Diecast's short-term need for cash. During this period, and during the entire period in which Riccitelli proposed the loan package for Diecast and TJK, and when BHB was evaluating whether to extend credit to Diecast and TJK, Riccitelli never disclosed that he was a creditor of Diecast being owed repayment on both the new loan of $80,000 and on Diecast's prior remaining indebtedness of $38,500. The $38,500 in outstanding loans existed in November 2014, when Riccitelli formally proposed the loan package. Riccitelli expected to be paid back from the loans that Riccitelli expected BHB would extend to Diecast and TJK.

In proposing that BHB give Diecast and TJK the $4.2 million loan package, Riccitelli understood that his identity as creditor on loans to Diecast would not be disclosed to BHB. Riccitelli understood that disclosure of his identity as the creditor on these loans as well as full disclosure of the total indebtedness on these loans, while he was also acting on behalf of the bank to propose the $4.2 million loan package, would have led to the rejection of the loan package by BHB.

The loan package closed on January 20, 2015. On January 23, 2015, immediately after Zastawny and Diecast received the loan proceeds, Zastawny repaid Riccitelli $80,000, using the money she received from BHB.

Riccitelli shared in the loan proceeds given by BHB to Zastawany and Diecast when he received the $80,000 on January 23, 2015. Riccitelli acted with the intent to defraud BHB by proposing a commercial loan package in which he had an interest. Riccitelli owed a fiduciary duty to the bank but instead subordinated the bank's interest to his own when he proposed the loan package. Riccitelli knew, but chose not to disclose to BHB personnel charged with evaluating the creditworthiness of Diecast and TJK, his identity as a creditor of Diecast and the total amount of his loans to Diecast. Riccitelli knew and understood that the non-disclosure of Diecast's full indebtedness, and his receipt of $80,000 (i.e., money that was supposed to bolster the capital needed by Diecast and help Diecast achieve and maintain financial stability), could only make it more difficult for Diecast to repay the money loaned by BHB to Diecast.

Although he was paid back in some instances, Riccitelli also suffered financial losses due to his dealings with Diecast and Zastawny. In March of 2013, a loan of $100,000 was made to Zastawny, secured by a mortgage on her residential property. This loan was made before Riccitelli had any connection or employment with BHB. Riccitelli and West Providence Real Estate have not been paid back on this loan. Additionally, in February of 2016, Diecast and Zastawny solicited Riccitelli for a working capital loan. As a result, Riccitelli made a working capital advance to Diecast at that time in the amount of $30,000. This loan also has not been repaid.

In July 2016, BHB foreclosed on the loans to Diecast and TJK. The bank has sustained substantial losses on this loan package.

2